**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2214**

ARLEAN K. BROWN, as the Personal Representative of Melvin K. Lawhorn,

Plaintiff - Appellee,

v.

BRIAN ELLIOTT; JIM MATTHEWS, individually and in his official capacity as the Sheriff of Kershaw County; KERSHAW COUNTY SHERIFF'S OFFICE; KERSHAW COUNTY,

Defendants - Appellants.

**No. 16-2218**

ARLEAN K. BROWN, as the Personal Representative of Melvin K. Lawhorn,

Plaintiff - Appellant,

v.

BRIAN ELLIOTT; JIM MATTHEWS, individually and in his official capacity as the Sheriff of Kershaw County; KERSHAW COUNTY SHERIFF'S OFFICE; KERSHAW COUNTY,

Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Columbia. J. Michelle Childs, District Judge. (3:14-cv-01188-JMC)

Argued: September 15, 2017                    Decided: November 21, 2017

Before MOTZ, TRAXLER, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Traxler and Judge Keenan joined.

**ARGUED:** H. Thomas Morgan, Jr., DUBOSE-ROBINSON, PC, Camden, South Carolina, for Appellants/Cross-Appellees. Jordan Christopher Calloway, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Robert V. Phillips, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellee/Cross-Appellant.

DIANA GRIBBON MOTZ, Circuit Judge:

This case arises from the fatal police shooting of Melvin Lawhorn. His personal representative, Arlean Brown, brought this action in state court, asserting Fourth Amendment excessive force claims, pursuant to § 1983, and various state law claims against Kershaw County, the County Sheriff's Office, Sheriff Jim Matthews, and Deputy Sheriff Brian Elliott (collectively, "the Defendants"). After the Defendants removed the case, the district court dismissed Ms. Brown's § 1983 claims against the County and the Sheriff's Office and against Sheriff Matthews and Deputy Elliott in their official capacities. The court then granted summary judgment on Ms. Brown's claims against Sheriff Matthews and Deputy Elliott in their personal capacities, holding them entitled to qualified immunity, and remanded the state law claims to state court. In the course of litigation, the district court also imposed a monetary discovery sanction on the Defendants. The Defendants appeal that discovery sanction. Ms. Brown cross-appeals, challenging the discovery sanction as insufficient and contending that Sheriff Matthews and Deputy Elliott are not entitled to qualified immunity. For the reasons that follow, we affirm.

I.

A.

The traffic stop at the center of this case occurred on February 28, 2012, around 8:23 p.m. That evening, officers with the Kershaw County Sheriff's Office, including Deputy Elliott, received a tip from a confidential informant that Melvin Lawhorn would

3

be purchasing and transporting a large quantity of cocaine in a truck along a given rural road and that Lawhorn "usually carr[ies] a gun . . . when he goes and picks up dope." The detectives set up a perimeter along the route. When the truck passed Deputy Elliott, it was speeding and crossed the center line, so he initiated a traffic stop by activating his blue lights. The truck pulled over. Deputy Elliott approached the truck from the passenger side, where Lawhorn, the suspect, was sitting with his window halfway down. Deputy Mickey Sellers approached the truck from the driver's side. The driver, Darryl Herbert, kept his foot on top of the accelerator with the truck's engine still running.

As Deputy Elliott arrived at the passenger door, Lawhorn jumped toward the driver's seat, put his left foot on top of the driver's foot on the gas pedal, and attempted to shift the truck into drive. The deputies shouted "freeze" and "don't move." Deputy Elliott leaned inside the passenger-side window to grab Lawhorn. However, Lawhorn successfully shifted the truck into drive, and the truck began moving forward. Moments later, Deputy Elliott, who stated that he feared for his life and that of the other officers, reached for his gun and fired one shot into the truck, striking Lawhorn in the back and killing him.

The magistrate judge recommended and the district court held that Deputy Elliott (and Sheriff Matthews) were entitled to qualified immunity, because, even viewing the evidence in the light most favorable to Ms. Brown, Deputy Elliott did not violate clearly established law. Ms. Brown challenges the grant of qualified immunity.

4

B.

During discovery, Ms. Brown requested that the Defendants produce copies of "any and all videos, dash cam, body cam, etc., from the officers' body cams and/or vehicles involved in the incident." She also requested, "If no videos are produced . . . explain in detail why there are no videos." The Defendants responded, "There are no dash or body cameras involved in this incident." In response to an interrogatory asking for the "make and model number of the dash cams in the two vehicles involved in the incident," the Defendants similarly answered that "[t]hese vehicles were not equipped with dash cams at the time of the incident."

But in a batch of photos produced by the non-party South Carolina Law Enforcement Division, which investigates officer-involved shootings, Ms. Brown discovered photos of a police car showing what looked like a video camera mounted inside the windshield. It is undisputed that the photos depict the car driven that night by one of the deputies present at the traffic stop.

Ms. Brown moved for default judgment as a sanction for this asserted discovery violation. The district court agreed that "the defendants did not accurately respond to [Ms. Brown's] discovery requests regarding the existence of cameras in the police vehicles involved in this case." The court, however, refused to grant Ms. Brown a default judgment, instead ordering the Defendants to pay Ms. Brown the attorney's fees and costs "incurred in connection" with the matter, which the court found to be $11,550.

On appeal, the Defendants challenge the district court's award of attorney's fees. Ms. Brown cross-appeals, arguing that the court should have granted a default judgment as a sanction for the discovery violation.

## II.

We first address the qualified immunity question, reviewing de novo the district court's award of summary judgment. *See Meyers v. Baltimore Cty.*, 713 F.3d 723, 730 (4th Cir. 2013).

### A.

Qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted).

The Supreme Court initially required that the inquiry proceed in a sequential two-step process — a court should first decide whether the plaintiff had shown a violation of a constitutional right, *and* only if so, determine whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). In 2009, however, the Court changed course, holding that a court may "skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Pearson*, 555 U.S. at 232, 236 (quoting *Saucier*, 533 U.S. at 201) (internal quotation marks omitted). Thus, we may

"skip ahead to the question whether the law *clearly established* that the officer's conduct was unlawful in the circumstances of the case." *Id.* at 232 (emphasis added) (quoting *Saucier*, 533 U.S. at 201) (internal quotation marks omitted). We take that approach in this case.

To resolve whether the law is "clearly established," a court must initially ascertain the "circumstances of the case." *Id.* (quoting *Saucier*, 533 U.S. at 201) (internal quotation marks omitted). At summary judgment, in the qualified immunity context as in others, courts must view the evidence in the light most favorable to the party opposing summary judgment. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). The Supreme Court has emphasized "the importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong" of the qualified immunity analysis. *Id.* Thus, when resolving the issue of qualified immunity at summary judgment, a court must ascertain the "circumstances of the case" by crediting the plaintiff's evidence and drawing all reasonable inferences in the plaintiff's favor.

A court must then ask whether the official's conduct under these "circumstances" violated "clearly established law." *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). We do not, however, "define clearly established law at a high level of generality," because the "dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Luna*, 136 S. Ct. at 308 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), as "when extreme though unheard-of actions violate the Constitution,"

7

*Camreta v. Greene*, 563 U.S. 692, 728 (2011). But the state of the law must be "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates'" the law in the circumstances the defendant confronted. *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). Thus, for example, the Supreme Court in *White v. Pauly* reversed a denial of qualified immunity, because the lower court "failed to identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment," and it was "not a case where it is obvious that there was a violation of clearly established law." 137 S. Ct. 548, 552 (2017) (per curiam).

Turning to the "circumstances" of the case at hand, the parties agree on all the facts set forth above, including the fact that Deputy Elliott was leaning inside the truck when the decedent, Lawhorn, put the truck in motion. The parties dispute, however, whether Deputy Elliott was "stuck" in the truck and being "dragged" by it at the moment he fired his gun. Deputy Elliott and Deputy Aaron Threatt, who was also on the scene, testified that Deputy Elliott was "stuck" and "dragged." But Ms. Brown offered evidence — including the testimony of the truck's driver, Darryl Herbert — that Deputy Elliott was neither "stuck" nor "dragged." Given this conflict in the evidence, the district court, in accord with the recommendation of the magistrate judge, correctly "assumed . . . that Elliott was not [stuck or] dragged."

8

The magistrate judge further concluded, and the district court agreed, that whether Deputy Elliott was dragged was "immaterial," because, even assuming that he was not dragged, he was entitled to qualified immunity.[1]  This was so, the magistrate judge reasoned, because it was undisputed that Lawhorn placed Deputy Elliott in danger by "placing the truck in motion while [Deputy] Elliott was *leaning in through the passenger window*" (emphasis added).  As the district court noted, although Ms. Brown filed lengthy exceptions to the magistrate judge's report, she never directly disputed this assessment by the magistrate judge that "immediately prior to and at the very moment [Deputy Elliott] fired the fatal shot," he was "substantially leaning inside the cab of the truck."  On appeal, Ms. Brown does briefly make such an argument; we will assume that she preserved it by her general exceptions to the magistrate judge's report.

Deputy Elliott, of course, testified that his torso was inside the truck when he fired the shot, as did Deputy Threatt.  Ms. Brown, however, states that "[s]everal pieces of evidence . . . indicate no part of Elliott's body was inside the truck at the time he fired." Appellee/Cross-Appellant Br. 42.  In support of this claim, she cites the testimony of

---

[1] Ms. Brown, repeatedly, and incorrectly, insists this conclusion lies at odds with our statement in *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992), that, in that case, "a determination of what actually happened [was] absolutely necessary to decide whether [the officer] could reasonably have believed that his actions were lawful."  But, of course, as we made clear in *Rainey*, "what actually happened" only "need[s] to be resolved by the trier of fact" if that determination is necessary "in order to reach a decision on the applicability of qualified immunity."  *Id.* (distinguishing *Gooden v. Howard Cty.*, 954 F.2d 960, 965–66 (4th Cir. 1992) (en banc), where, for this reason, it was not necessary to determine what "actually happened").  Here, it is not necessary to resolve this dispute.  Rather, for purposes of summary judgment, like the district court, we credit Ms. Brown's witnesses and assume that Deputy Elliott was not "stuck" in the truck or "dragged" by it.

Darryl Herbert, who drove the truck, Deputy Sellers, and her biomechanical expert. But none of these witnesses (or anyone else) so testified.

Ms. Brown's reliance on the testimony of Darryl Herbert, the driver of the truck, is particularly inexplicable, for he, like Deputies Elliott and Threatt, unequivocally testified that Deputy Elliott's torso was *inside* the truck when the shot was fired.[2] Although Herbert stated that he was certain that Deputy Elliott was not dragged by the truck, he was equally certain that Deputy Elliott's "body it's [sic] . . . torso part . . . [was] . . . inside the window[]" of the truck. Herbert vividly recalled that Deputy Elliott was "reaching in the window, grabbing" Lawhorn and as Lawhorn shifted the truck into drive and it began moving, Deputy Elliott "kept screaming stop, stop. And I was screaming the same thing, stop, stop. . . . [A]nd then after a few seconds, bop." Neither Deputy Sellers nor the expert offered contrary testimony. Deputy Sellers explained that he had turned away from the truck to return to his car and so did not see Deputy Elliott at the critical moment when the shot was fired. As for the expert, while he opined that Deputy Elliott could not have been dragged by the truck when he fired the shot, he did *not* opine that Deputy Elliott's torso was or must have been outside the truck when he fired the shot.

Thus, viewing the evidence in the best light for Ms. Brown, for purposes of summary judgment Deputy Elliott was neither "stuck" in the truck nor "dragged" by it,

---

[2] As Ms. Brown herself notes, Herbert was "sitting less than five feet" from Lawhorn. Appellant/Cross-Appellee Br. 38. Thus, he had an excellent vantage point to determine whether Deputy Elliott's torso was in the truck at the time of the fatal shot.

but the evidence was undisputed that Deputy Elliott's torso was inside the truck when he fired the fatal shot.

B.

With these "circumstances of the case" in mind, we turn to the question of whether any controlling authority clearly established that an officer must abstain from employing deadly force when a suspect puts a vehicle in motion while the officer is leaning into it.

Ms. Brown does not cite, nor have we found, a single case that so holds. In arguing to the contrary, Ms. Brown principally relies on two clearly distinguishable cases. The first is *Krein v. Price*, 596 F. App'x 184 (4th Cir. 2014), an unpublished decision that cannot constitute "clearly established law," *see Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 542–43 (4th Cir. 2017). The second is *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005), on which *Krein* primarily relies. Those cases hold that an officer violates the Fourth Amendment by continuing to fire shots at a motorist after the motorist's car has passed the officer. *See Waterman*, 393 F.3d at 482 ("[O]nce Waterman's vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots."). The critical circumstance in those cases was that officers fired several shots after the driver "had *passed* [the officers] without veering in their direction." *Id.* (emphasis added); *see also Krein,* 596 F. App'x at 192 (finding that officers fired shots "after the car had *passed* the police officers" (emphasis added)).

Were we confronted with similar circumstances here, we would conclude that Deputy Elliott violated clearly established law. But those are not the circumstances of this case. When Deputy Elliott fired his gun, he was leaning into the window of a

11

moving truck, not standing off to the side as the truck passed him without veering in his direction. He was, as police officers frequently are, "forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). No "existing precedent placed the conclusion that [Deputy Elliott] acted unreasonably in these circumstances 'beyond debate,'" *Luna*, 136 S. Ct. at 309 (quoting *al–Kidd*, 563 U.S. at 741). Nor has Ms. Brown suggested that Deputy Elliott's actions were so "extreme" to place him "on notice that [his] conduct violated established law even in novel factual circumstances." *See Camreta*, 563 U.S. at 728; *Hope*, 536 U.S. at 741. For these reasons, the Defendants are entitled to qualified immunity.

Ms. Brown contends that we must "delv[e] into the reasons" that Deputy Elliott "cites for his decision" to fire his weapon. Appellee/Cross-Appellant Br. 38. She maintains that Deputy Elliott explained that he feared for his life and so justified his use of force "for no other reason" than he was dragged by the truck, and since she offered evidence that he was not dragged, he was not entitled to qualified immunity. *Id.*[3] But the law is well-settled that the qualified immunity inquiry turns on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law," not on the official's "subjective intent." *Harlow v. Fitzgerald*, 457 U.S. 800, 816–18 (1982). Thus, "our Court has consistently conducted an objective analysis of qualified

---

[3] Actually, this does not accurately characterize Deputy Elliott's testimony. He also testified that he feared injury or death because he might be "completely run over" and that he feared for the safety of the other deputies, particularly given that Lawhorn might be carrying a gun.

immunity claims and stressed that an officer's subjective intent or beliefs play no role." *Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2001) (en banc). The relevant question is fact-specific *but* objective, asking whether the law clearly established that an officer's conduct was unlawful in the particular circumstances he or she confronted. Deputy Elliott's subjective intent and his professed justifications for his use of force are irrelevant to that inquiry.[4]

Our holding today, however, should not be read to suggest that Deputy Elliott's use of force here was in fact reasonable under the Fourth Amendment. We express no view as to the alleged constitutional violation itself. Instead, we simply hold that existing law did not *clearly establish* that an officer in Deputy Elliott's situation violates the Fourth Amendment by using deadly force. Accordingly, we affirm the grant of summary judgment to the Defendants.

## III.

Finally, we address the district court's fee award, which it imposed as a sanction for the Defendants' discovery misconduct. "We review the imposition of discovery

---

[4] Ms. Brown argues that *Waterman*, 393 F.3d at 477, is to the contrary. In *Waterman*, we noted that because the officers there argued only that their use of force was justified by the threat "posed to them and their fellow officers — as opposed to the general public — we confine[d] our analysis to that issue." *Id.* Contrary to Ms. Brown's suggestion, this statement did not open the door to probing an officer's subjective beliefs. Rather, the officers in *Waterman* simply declined to make a specific argument within the objective qualified immunity inquiry — namely, the argument that the officers did not violate clearly established law because circumstances objectively indicated a threat to the *public*. The officers' subjective beliefs about the threat posed by their circumstances were irrelevant there as they are here.

sanctions for abuse of discretion." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329 (4th Cir. 2011).

The Defendants argue that the sanction was unwarranted. Ms. Brown contends in response that the Defendants failed to preserve this argument for appeal, because they did not present it in response to Ms. Brown's motion, but rather only raised it in a later motion for reconsideration. We need not resolve whether the Defendants waived their argument, because we hold that the district court did not abuse its discretion by imposing a monetary sanction.

Federal Rule of Civil Procedure 37(c) provides that if a party "fails to provide information" and the failure is not "substantially justified or is harmless," "the court, on motion and after giving an opportunity to be heard," "may order payment of the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(c)(1).

The Defendants failed to provide the information that at least one officer's car had video camera equipment mounted inside the windshield. During discovery, Ms. Brown requested that the Defendants produce copies of "any and all videos, dash cam, body cam, etc., from the officers' body cams and/or vehicles involved in the incident." She also requested, "If no videos are produced . . . explain in detail why there are no videos." The Defendants responded that "[t]here are no dash or body cameras involved in this incident." At the very least, this response was misleading by omission, since one of the officer's cars in fact had camera equipment mounted inside the windshield. The Defendants argue that because this car lacked the recording unit (usually found in the rear

14

of the car) needed to actually record video, their responses were technically accurate. We disagree. A reasonable person would not think that the statement "[t]here are no dash or body cameras involved in this incident" means the same thing as "there was a dash camera but it could not record video because it was missing a critical component." To the extent the Defendants wanted to specify exactly which components of the camera system were present and which ones were not, it was incumbent on them to provide that level of detail in response to Ms. Brown's discovery requests. They did not.

Moreover, we cannot conclude that the Defendants' failure to provide information was substantially justified or harmless. Rather, their inaccurate statements are especially glaring given that in cases like this, a video recording of the incident frequently becomes the pivotal piece of evidence in litigation. The Defendants' failure to fully and accurately explain the lack of video evidence needlessly prolonged litigation and required both Ms. Brown and the district court to devote resources to the issue.

Ms. Brown contends on cross-appeal that the district court did not go far enough and should have granted a default judgment. We disagree. We have previously "encouraged trial courts initially to consider imposing sanctions less severe than default." *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 41 (4th Cir. 1995) (reversing grant of default judgment). Granting a default judgment for discovery violations, after all, ends a case without resolving the underlying legal and factual disputes. While we have affirmed grants of default where a party engaged in "repeated misconduct never wholly remedied in the future," *see, e.g.*, *Mut. Fed. Sav. and Loan Ass'n v. Richards & Assocs.*, 872 F.2d 88, 94 (4th Cir. 1989), here there is no indication that the Defendants persisted

15

in their misconduct after being sanctioned.  Accordingly, we affirm the district court's fee award.

## IV.

For the reasons stated, we affirm in all respects the judgment of the district court.

*AFFIRMED*

16